# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION** | **MDL NO. 2724**<br>**16-md-2724** |
| *IN RE: CLOBETASOL CASES* | **DPP CASE: 16-CB-27241** |
| *IN RE: CLOMIPRAMINE CASES* | **DPP CASE: 16-CM-27241** |
| **THIS DOCUMENT APPLIES TO:**<br>*DPP BELLWETHER ACTIONS* | |

## <u>OPINION</u>

**Rufe, J.**                                                    **March 7, 2025**

This multidistrict antitrust litigation ("MDL") concerns alleged price-fixing schemes involving numerous generic drugs and generic drug manufacturers. The Court selected initial bellwether cases from the proposed class actions brought by End-Payer Plaintiffs ("EPPs") and Direct Purchaser Plaintiffs ("DPPs") as to two generic drugs, clomipramine and clobetasol. This Opinion considers DPPs' motion to certify class in the bellwether actions for clomipramine and clobetasol.

## I.    BACKGROUND

Clobetasol is a potent topical corticosteroid that is prescribed for various inflammatory skin conditions, in one of five formulations: cream, ointment, emollient cream, solution, and gel.[1] Clomipramine is an oral medication used to treat obsessive compulsive disorder ("OCD").[2] DPPs contend that Defendants colluded in violation of federal antitrust laws to raise the price of

---

[1] Consolidated Class Action Compl. [Clobetasol], No. 16-CB-27241 [Doc. No.74] ¶ 1, 5.

[2] Consolidated Class Action Compl. [Clomipramine], No. 16-CM-27241 [Doc. No. 61] ¶ 5.

clomipramine beginning in 2013 and clobetasol beginning in 2014.[3] DPPs initially sought to certify the following classes of direct purchaser plaintiffs who allege injury arising from the allegedly anticompetitive actions by Defendants—

> For Clobetasol:
>
> All persons or entities that directly purchased Clobetasol (generic clobetasol propionate topical ointment .05% (15, 30, 45, or 60 gm), topical solution .05% (25 or 50 ml), topical gel .05% (15, 30, or 60 gm), topical cream .05% (15, 30, 45, or 60 gm), or topical emollient cream .05% (15, 30, or 60 gm)) from one or more of the Clobetasol Defendants in the United States and its territories and possessions at any time during the period from June 3, 2014 through December 31, 2018 (the "Clobetasol Class Period"). Excluded from the Class are the Defendants [] and their officers, directors, management, employees, subsidiaries, or affiliates, judicial officers and their personnel, and all governmental entities.[4]
>
> For Clomipramine:
>
> All persons or entities that directly purchased Clomipramine (generic clomipramine hydrochloride 25, 50, or 75 mg capsules) from one or more of the Clomipramine Defendants in the United States and its territories and possessions at any time during the period from May 1, 2013 through the December 31, 2018 (the "Clomipramine Class Period"). Excluded from the Class are the Defendants [] and their officers, directors, management, employees, subsidiaries, or affiliates, judicial officers and their personnel, and all governmental entities.[5]

In their reply memorandum of law in support of the motion for class certification, DPPs revised their class definitions in response to Defendants' argument that the original proposed class included uninjured class members,[6] stating: "DPPs have revised the proposed Class definition to exclude by definition (as set forth in subpart (d) in the class definition, below) the purchasers that Defendants say were uninjured, mooting Defendants' arguments that impact to the Class cannot

---

[3] Further information on allegations in the bellwether cases may be found in the Court's Opinion of December 5, 2024. *In re Generic Pharms. Pricing Antitrust Litig.*, 2024 WL 4989070 (E.D. Pa. Dec. 5, 2024).

[4] DPPs' Mem. Supp. Mot. Certification Class Clobetasol Direct Purchasers at 21, 16-CB-27241, [Doc. No. 137].

[5] DPPs' Mem. Supp. Mot. Certification Class Clomipramine Direct Purchasers at 20-21, 16-CM-27241, [Doc. No. 87]. Throughout the discussion, after first reference, where the discussion pertains to both clomipramine and clobetasol documents, the Court cites the relevant clomipramine document.

[6] Defendant did have an opportunity to respond to DPPs' revision and the Court considered all arguments. It is highly unusually, however, that DPPs saw fit to change their class definition mid-briefing through a footnote.

be proven with class-wide evidence. Specifically, DPPs revised their definition with the intention to exclude from the class direct purchasers who purchased clomipramine (a) prior to the 'conspiratorial price increases' and (b) after the 'conspiratorial price increases' but did not experience a price increase."[7] Each revised definition is as follows:

For Clobetasol:

 All persons or entities that directly purchased clobetasol (generic clobetasol propionate topical ointment .05% (15, 30, 45, or 60 gm), topical solution .05% (25 or 50 ml), topical gel .05% (15, 30, or 60 gm), topical cream .05% (15, 30, 45, or 60 gm), or topical emollient cream .05% (15, 30, or 60 gm)) from one or more of the Clobetasol Defendants in the United States and its territories and possessions at any time during the period from June 3, 2014 through December 31, 2018 (the "Clobetasol Class Period"). Excluded from the Clobetasol Class are (a) the Defendants and former defendants [] and their officers, directors, management, employees, subsidiaries, or affiliates, (b) judicial officers and their personnel, (c) all governmental entities, and (d) all persons or entities that (i) purchased at least one form of clobetasol (i.e., ointment, topical solution, topical gel, topical cream, or topical emollient cream) during the period May 15, 2013 to May 14, 2014 ("Clobetasol Pre Period") and at least one of the same forms during the Clobetasol Class Period and (ii) whose purchase prices (measured in dollars and cents) for all of the form(s) purchased in both Periods did not increase during the Clobetasol Class Period as compared to the Clobetasol Pre Period.[8]

For Clomipramine:

All persons or entities that directly purchased clomipramine (generic clomipramine hydrochloride 25, 50, or 75mg capsules) from one or more of the Clomipramine Defendants in the United States and its territories and possessions at any time during the period from May 1, 2013 through December 31, 2018 (the "Clomipramine Class Period"). Excluded from the Clomipramine Class are (a) the Defendants or former defendants [] and their officers, directors, management, employees, subsidiaries, or affiliates, (b) judicial officers and their personnel, (c) all governmental entities, and (d) all persons or entities that (i) purchased at least one strength of clomipramine (i.e., 25, 50, or 75mg capsules) during the period March 18, 2012 to March 17, 2013 ("Clomipramine Pre Period") and at least one of the same strengths during the Clomipramine Class Period and (ii) whose purchase prices (measured in dollars and cents) for all of the strength(s)

---

[7] DPP's Reply Mem. Supp. Mot. Certification Class Clomipramine Direct Purchaser at 10 n.2, 16-CM-27241 [Doc. No. 105].

[8] *Id*. at 2 n.2.

purchased in both Periods did not increase during the Clomipramine Class Period as compared to the Clomipramine PrePeriod.[9]

Defendants in the Clobetasol case are: Actavis Holdco U.S. Inc.; Akorn, Inc.; Fougera Pharmaceuticals Inc.; Hi-Tech Pharmacal Co. Inc.; Sandoz, Inc.; Morton Grove Pharmaceuticals, Inc.; Taro Pharmaceuticals U.S.A. Inc.; and Wockhardt USA LLC.

Defendants in the Clomipramine case are Mylan Inc; Sandoz, Inc.; and Taro Pharmaceutical U.S.A., Inc. While DPPs have settled with Taro and it is no longer a Defendant in either case, DPPs continue to seek damages for Taro's sales from the remaining Defendants under the theory of joint and several liability.

As a necessary prelude to class certification, the Court ruled on motions to exclude the opinions of several experts whose opinions have bearing on class certification. In DPPs' cases, the Court: (1) granted DPPs' motion to exclude defense expert Dr. Richard Gilbert's opinions in part, related to his testimony that economic evidence has no bearing on the ability to differentiate legal and illegal interdependent conduct, (2) granted Defendants' motion to exclude DPPs' expert Dr. Thomas McGuire, in part, to the extent that he opined that his conditional probability test demonstrated the existence of a "super" plus factor, and (3) granted Defendants' motion to exclude DPPs' expert Dr. Jeffrey Leitzinger's opinions, in part, related to his alternative overcharge model. The Court denied each motion for exclusion related to those experts on all other bases.[10] The parties in the DPPs' matter presented oral argument on class certification on December 18, 2024, after the Court ruled on the motions to exclude.

---

[9] DPP's Reply Mem. Supp. Mot. Certification Class Clobetasol Direct Purchaser at 10 n.2, 16-CM-27241 [Doc. No. 105].

[10] *In re Generic Pharms. Pricing Antitrust Litig.*, 2024 WL 4989070 at *23.

## II.   LEGAL STANDARD

For class certification to be granted, Plaintiff must first demonstrate that the four elements of Federal Rule of Civil Procedure 23(a) have been met. These elements are: (1) numerosity—the class is so numerous that joinder of all members is impracticable; (2) commonality—there are questions of law or fact common to the class; (3) typicality—the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) adequate representation—the representative parties will fairly and adequately protect the interests of the class.[11] In addition, a class action must satisfy at least one of the three elements of Rule 23(b)(1), (2), or (3) before a class can be certified.[12]

In the Third Circuit, Rule 23(b)(3) also requires that class be "currently and readily ascertainable based on objective criteria."[13] The Third Circuit has reaffirmed its holding that Rule 23 contains a heightened ascertainability requirement under which class plaintiffs must plead and prove an administratively feasible mechanism for identifying class members in *In re Niaspan Antitrust Litigation*[14], which denied class certification on administrative-feasibility grounds. This ascertainability requirement is two-fold: "(1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition."[15] The party seeking class certification has the burden as to all elements,[16] and the Court must conduct "a 'rigorous

---

[11] *See* Fed. R. Civ. P. 23(a). *See Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 595 (3d Cir. 2012).

[12] *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011) (citations omitted).

[13] *In re Niaspan Antitrust Litigation,* 67 F.4th 119, 129 (3d Cir. 2023).

[14] 67 F.4th 119.

[15] *Id*. at 469–70.

[16] *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 248 (3d Cir. 2016), *as amended* (Sept. 29, 2016) (quoting *Marcus*, 687 F.3d at 591).

analysis' of the evidence and arguments put forth."[17] The Court may be required to resolve factual or legal disputes relevant to class certification, and factual determinations must be made by a preponderance of the evidence.[18]

### III.    DISCUSSION

#### A.    Rule 23(a)

DPPs argue that the proposed classes satisfy the requirements under Rule 23(a): numerosity, commonality, typicality, and adequacy. Defendants, however, argue that DPPs fail to establish numerosity and adequacy.

##### 1.    Numerosity

DPPs contend that the proposed revised clobetasol class includes 128 members (118 in the original definition),[19] and the proposed revised clomipramine class includes 69 members (73 in the original definition).[20] DPPs argue that their proposed classes are too numerous for practical joinder of the parties and assert that geographic dispersion among plaintiffs would unnecessarily burden the legal system.[21] But Defendants argue that joinder is a practical alternative to class certification in these cases, given the proposed class sizes and the sophistication of the proposed members.[22] According to Defendants, joinder is preferable to class certification in these cases because many of the proposed class members are already involved in

---

[17] *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 591 (3d Cir. 2012) (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 316 (3d Cir. 2008), *as amended* (Jan. 16, 2009)).

[18] *Hydrogen Peroxide*, 552 F.3d at 307.

[19] DPPs' Mem. Supp. Mot. Certification Class Clobetasol Direct Purchasers at 2, 16-CB-27241, [Doc. No. 137]; DPP's Reply Mem. Supp. Mot. Certification Class Clobetasol Direct Purchaser at 8, 16-CM-27241 [Doc. No. 155].

[20] DPPs' Mem. Supp. Mot. Certification Class Clomipramine Direct Purchasers at 2, 16-CM-27241, [Doc. No. 87]; DPP's Reply Mem. Supp. Mot. Certification Class Clomipramine Direct Purchaser at 15, 16-CB-27241 [Doc. No. 105].

[21] DPP's Reply Mem. Supp. Mot. Certification Class Clomipramine Direct Purchaser at 23-25, 16-CM-27241 [Doc. No. 105].

[22] *See* Defs.' Opp'n Class Certif. at 9-24, 16-CM-27241 [Doc. No. 99].

the MDL: about 25 have provided third-party discovery,[23] five were previously named as Defendants by the IRPs,[24] and 10 have filed direct actions in the MDL (not all relating to clomipramine or clobetasol).[25] Further, Defendants argue that DPPs' class sizes are inflated because they count separately parents and subsidiaries, and that grouping them together would reduce the class sizes by one-third.[26]

The numerosity requirement "prevents putative class representatives and their counsel, when joinder can be easily accomplished, from unnecessarily depriving members of a small class of their right to a day in court to adjudicate their own claims."[27] In *In re Modafinil Antitrust Litigation*, the Third Circuit delineated the following factors for when considering the numerosity requirement: 1) judicial economy; 2) ability and motivation to be joined as plaintiffs; 3) financial resources of class members; 4) geographic dispersion of class members; 5) ability to identify future claimants; and 6) whether the claims are for injunctive relief or damages.[28] Judicial economy and the ability to litigate as joined parties are the most significant of these.[29] The Third Circuit stressed that "[t]hese factors are only relevant to a binary choice at the

---

[23] AmerisourceBergen (now Cencora), Benecard Central Fill, Capital Wholesale, Cardinal Health, Dakota Drug, DMS Pharmaceutical, Drogueria Betances, Express Scripts, H.D. Smith Wholesale, Harvard Drug, J M Smith Corp., Louisiana Wholesale, McKesson, Miami Luken, Morris & Dickson, North Carolina Mutual Wholesale Drug, OptumRx, PBA Health, Pharmacy Buying Association, Prescription Supply, Publix Super Markets, Valley Wholesale Drug, Value Drug, and Walmart. Defs.' Opp'n Class Certif. at 22 n.15, 16-CM-27241 [Doc. No. 99].

[24] Distributors are AmerisourceBergen (now Cencora), Cardinal Health, H.D. Smith Wholesale, Harvard Drug, and McKesson. Defs.' Opp'n Class Certif. at 23 n.16, 16-CM-27241 [Doc. No. 99]. However, the Court dismissed the IRPs' complaint against the Distributor Defendants. *In re Generic Pharms. Pricing Antitrust Litig.*, 2025 WL 388813 (E.D. Pa. Feb. 3, 2025).

[25] These Direct Action Plaintiffs ("DAPs") are Albertsons, Cigna, CVS Caremark, H.E. Butt, Humana, JM Smith Corp., Kroger Company, Rite Aid, Smith Drug, and Winn Dixie. Defs.' Opp'n Class Certif. at 23 n.17, 16-CM-27241 [Doc. No. 99].

[26] *Id*. at 10.

[27] *Marcus*, 687 F.3d at 594-95 (citation omitted).

[28] 837 F.3d 238, 253 (3d Cir. 2016) (citations omitted).

[29] *Id*.

certification stage: a class action versus joinder of all interested parties. At this point, [a court does] *not* consider the possibility that plaintiffs may bring individual suits."[30] The Third Circuit has held that a putative class of more than 40 members "faces a relaxed burden under [Third Circuit] precedent."[31] DPPs' proposed classes meet this threshold.

First, DPPs have demonstrated that both classes exceed 40 members, and thus the Court will assess numerosity for both classes under a relaxed burden. With regard to Defendants' argument that DPPs' numbers are overstated by approximately 33 percent because of consolidated entities and uninjured purchasers, "[a]ny attempt to 'pick off' proposed class members is best addressed in a Rule 23(b)(3) predominance argument rather than a Rule 23(a)(1) numerosity argument."[32] Moreover, each of DPPs' proposed class sizes exceeds 40 even under Defendants' calculations. For the clobetasol class, Defendants concede that there are 90 class members at minimum.[33] Similarly, for the clomipramine class, Defendants concede that there are at least 46 members of the class.[34]

Nonetheless, DPPs must demonstrate by a preponderance of the evidence that it is impractical to join the members of each class.[35] Even where a proposed class comprises more than 40 members, which provides the suggestion of impracticality, a court may still find that plaintiffs failed to adequately demonstrate that the *Modafinil* factors support a finding that joinder is impractical. Thus, the Court considers each *Modafinil* factor below.

---

[30] *Id.*

[31] *Allen v. Ollie's Bargain Outlet, Inc.*, 37 F.4th 890, 896 (3d Cir. 2022).

[32] *Value Drug Co. v. Takeda Pharms., U.S.A., Inc.,* 2023 WL 2314911, at *8 (E.D. Pa. Feb. 28, 2023).

[33] Defs. Corrected Sur-Reply Supp. Opp'n to DPPs Mot. Class Certification at 17, 16-CB-27241 [Doc. No. 182].

[34] Defs. Corrected Sur-Reply Supp. Opp'n to DPPs Mot. Class Certification at 17, 16-CM-27241 [Doc. No. 130].

[35] *Mielo*, 897 F.3d at 484 (citing *Marcus*, 687 F.3d at 596–97).

*Judicial Economy*

The purpose of judicial economy, and the reason it is core to the court's assessment of numerosity, is to free courts from the burden of conducting administratively burdensome actions in which many parties are compelled to join and be present.[36] A court's judicial economy analysis will evaluate "the administrative burden that multiple or aggregate claims place upon the courts," including "docket control, taking into account practicalities as simple as that of every attorney making an appearance on the record." [37] Further, although courts cannot assess "sunk costs" of litigation, courts may rely on their "superior understanding of how the case has proceeded to date for the purpose of determining whether the class mechanism would have been a substantially more efficient use of judicial resources than joinder…."[38]

Defendants argue that DPPs have not demonstrated sufficient evidence that class certification in this case would be "substantially" more efficient than joinder of the parties.[39] In this case, Defendants contend that joinder is made possible by the substantial involvement of absent class members and shared counsel among plaintiffs, which they argue was sufficient to deny certification in other cases. Further, Defendants argue that DPPs improperly rely on arguments that joinder would require further discovery and that DPPs have failed to offer concrete evidence establishing that they meet their burden on judicial economy. DPPs in turn

---

[36] *Marcus*, 687 F.3d at 594.

[37] *Modafinil*, 837 F.3d at 254, 257 (citing *Marcus*, 687 F.3d at 594). It is useful to note that in *Modafinil*, the court certified a class of only 22 members.

[38] *Id*.

[39] Defs.' Opp'n Class Certif. at 12-13, 16-CM-27241 [Doc. No. 99].

argue that docket control issues are particularly of concern in this MDL and that Defendants overstate the efficiency of direct purchaser joinder actions.[40]

In the absence of direct evidence on numerosity, plaintiffs may offer circumstantial evidence specific to the facts at issue.[41] While DPPs rely in part on arguments that discovery issues present a potential issue for the efficiency of joinder, Third Circuit law is clear that a district court cannot consider such evidence when assessing judicial economy.[42] Thus, future discovery issues have no bearing on the Court's analysis of judicial economy. However, DPPs do offer other circumstantial evidence demonstrating that judicial economy would be threatened by a potential joinder action. For example, DPPs point to DAP actions in this case to demonstrate how judicial economy would be hampered if the DPPs' case proceeded through joinder, including that the DAPs are represented by many different attorneys, they do not take united positions, they will likely propose multiple experts on impact and damages, and the DAPs' bellwether proposals have consumed judicial resources. Further, as DPPs explain, joinder would require hundreds of docket entries for additional parties on the MDL and case-specific dockets.[43] These concerns invoke the type of docket management concerns that the *Modafinil* court contemplated.

---

[40] DPP's Reply Mem. Supp. Mot. Certification Class Clomipramine Direct Purchasers at 22-23, 16-CM-27241 [Doc. No. 105].

[41] *Marcus*, 687 F.3d at 596.

[42] *Modafinil*, 837 F.3d at 255-256.

[43] DPPs' Further Reply Supp. Mot. Certification Class Clomipramine Direct Purchasers at 7, 16-CM-27241 DPPs [Doc. No. 142] ("If the DPP clomipramine and clobetasol cases both proceeded via joinder, those actions could include more than 130 additional parties, most of which would need to be added to the MDL docket and the case-specific dockets created for these drugs… [according to Dr. Leitzinger's report] there are 61 entities common to both bellwether classes, 8 additional entities in the clomipramine class only, and 67 additional entities in the clobetasol class only… Thus, just as each bellwether class has a unique composition, each group of potentially joined plaintiffs would likely be unique").

DPPs' point is bolstered by the Court's own insight into the procedures and history of this MDL, and of the bellwether selection. Defendants offer several cases in which courts have declined to certify a class, instead finding that joinder is a practical alternative. None of those cases presents the level of complexity as this MDL—including cases with significantly fewer plaintiffs and allegations against manufacturers delayed entry for single drugs. Given the analysis of DPPs' circumstantial evidence above, it is likely that a joinder action would create significant additional burden and complexity in a matter that is uniquely complex, both factually and procedurally. Even if Defendants' lowest estimates of class membership were taken as true, joinder of dozens of plaintiffs, nearly 100 in the clobetasol class, would be unmanageable in the matters at hand.

DPPs have offered sufficient circumstantial evidence, supported by the Court's experience in this MDL, to demonstrate that joinder of these plaintiffs would burden judicial economy.

*Ability and Motivation to Litigate as Joined Plaintiffs*

Next, the Court's assessment of numerosity turns on the ability and motivation of the parties to litigate, considering "the stakes at issue for the individual claims and the complexity of the litigation, which will typically correlate with the costs of pursuing these claims."[44] This is particularly true where it would be uneconomical for claimants, particularly those with small claims, to litigate individually.[45] A court's assessment of this factor primarily concerns the cost and complexity of litigation, including the cost of counsel and discovery, as well other factors such as a plaintiffs' fear of retaliation.

---

[44] *Modafinil*, 837 F.3d at 257.

[45] *Id*. citing *Marcus*, 687 F.3d at 594.

DPPs argue that motivation to litigate is an issue here, in part because 15 of 69 members of the clomipramine class, and 43 of 128 members of the clobetasol class purchased less than $100,000 worth of each product.[46] Further, DPPs represent that 85 of 128 members of the clobetasol class and 43 of 69 of the clobetasol class purchased less than $1 million of each drug.[47] In addition, DPPs contend that distributors in this action may be less likely to join due to the fear of retaliation from manufacturers that they interact with regularly in the normal course of business.[48] Defendants, however, argue that the availability of treble damages offsets this concern and suggests that small parties might be able to share resources, as the parties in *Modafinil* did after being joined as individual parties on remand.[49] Further, Defendants argue that claimants with small claims may still choose to litigate due to having claims for multiple products across the MDL.[50] But, as DPPs point out, this applies only if all of those claims proceed via joinder—which would mean many new plaintiffs in various cases.

In *Modafinil*, the Third Circuit emphasized the fact that three plaintiffs, whose claims value 97 percent of the class claims, pursued claims of more than one billion dollars.[51] But in that case, only six entities pursed claims of less than one million dollars. Here, over 60 percent of members in both classes present claims of less than one million, and a sizeable portion of those claimants present claims of less than $100,000. The ability and motivation of the class members to litigate weighs in favor of class certification.

---

[46] DPPs' Further Reply Supp. Mot. Certification Class Clomipramine Direct Purchasers at 10-11, 16-CM-27241 DPPs [Doc. No. 142].

[47] Leitzinger Expert Rebuttal Report Ex. 4B, No. 16-CM-27241 [Doc. No. 159-94].

[48] DPP's Reply Mem. Supp. Mot. Certification Class Clomipramine Direct Purchaser at 20, 16-CM-27241 [Doc. No. 105].

[49] Defs.' Corrected Sur-Reply Supp. Opp'n to DPPs' Mot. Class Certif. at 12-13, 16-CM-27241 [Doc. No. 130].

[50] *Id*. at 12.

[51] *Modafinil*, 837 F.3d at 258-59.

*Financial Resources of Class Members*

The financial resources factor evaluates the ability for a class member to join based on financial means. The court's analysis into financial resources of the class members is a question related to, but distinct from, the question of whether a class member has the motivation and ability to litigate.[52] Defendants argue that the class members in this matter are sophisticated companies and contend that DPPs have failed to offer evidence that they do not have the resources to litigate through joinder.[53] Here, potential class members are direct purchasers in a complex industry and DPPs have not demonstrated that they lack the ability to litigate because of a dearth of financial resources. Thus, this factor does not weigh in favor of class certification.

*Geographic Dispersion*

In this day and age, discovery is aided by electronic communications and various proceedings, including class hearings and conferences, which may be conducted virtually. While advances in technology have made geographic dispersion less of a hindrance to joinder, issues involving the location of potential plaintiffs in a joinder action may still arise. Here, claimants are dispersed throughout the continental United States and Puerto Rico and involve multiple multinational corporations—a fact that Defendants do not contest. Instead, Defendants argue that this factor can weigh "only slightly" in favor of class certification considering various protocols in the MDL to facilitate remote participation in proceedings.[54] DPPs have nonetheless demonstrated significant geographic dispersion and the factor weighs in their favor for class certification.

---

[52] *Id.* at 253.

[53] Defs.' Corrected Sur-Reply Supp. Opp'n to DPPs' Mot. Class Certif. at 16, 16-CM-27241 [Doc. No. 130].

[54] Defs.' Opp'n Class Certif. at 20, 16-CM-27241 [Doc. No. 99].

*Ability to Identify Future Members*

The Court assesses the ability to identify future claimants as a traditional element of the numerosity analysis, as the need to join class members in the future may make joinder impossible. Here, all entities are known, the class periods are closed, and Defendants do not challenge that the classes are ascertainable. Therefore, the factor is neutral.

*Whether Claims are for Injunctive Relief or Damages*

Where plaintiffs seek injunctive relief, rigorous application of the numerosity requirement is not warranted.[55] This factor does not apply because DPPs seek damages.

In sum, the *Modafinil* factors weigh in favor of class certification. DPPs offer sufficient circumstantial evidence to meet their burden to establish numerosity, especially considering the Third Circuit's relaxed burden for classes that exceed 40 claimants.

2.  Commonality

DPPs contend that commonality is easily satisfied in these cases. In a court's analysis of commonality, one common issue is sufficient to satisfy the commonality requirement, focusing on whether Defendants' conduct is common to all class members.[56] Here, DPPs assert several common questions at issue in the Bellwether cases.[57] Defendants do not contest the DPPs' commonality. Because DPPs have adequately demonstrated common issues concerning Defendants' alleged conspiracy, commonality is satisfied.

---

[55] *See Weiss v. York Hosp.,* 745 F.2d 786, 808 (3d Cir. 1984).

[56] *Wal-Mart Stores*, 564 U.S. at 359; *See In re Mushroom Direct Purchaser Antitrust Litig.,* 319 F.R.D. 158, 174 (E.D. Pa. 2016).

[57] DPPs include the following questions in their briefing: "(1) whether the Clomipramine Conspirators colluded to impose the 2013 price increase; (2) whether the alleged conspiracy artificially inflated clomipramine prices; (3) whether members of the Class were injured by the Clomipramine Conspirators' conduct; and (4) if so, what is the appropriate class-wide measure of damages." DPPs' Mem. Supp. Mot. Certification Class Clomipramine Direct Purchasers at 25, 16-CM-27241, [Doc. No. 87].

### 3.  Typicality

DPPs assert common issues of law and fact that all class members made direct purchases of generic pharmaceuticals that were priced higher than they should have been because of an alleged conspiracy among Defendant manufacturers. Typicality is met where "the action can be efficiently maintained as a class and . . . the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentee's interests will be fairly represented.[58] Defendants do not challenge typicality. In this matter, DPPs proposed classes are comprised of direct purchasers, all of whom DPPs argue bore the same type of injury that results from Defendants' alleged agreement. DPPs' claims thus satisfy the typicality requirement under Rule 23(a).

### 4.  Adequacy

DPPs have proposed class representatives César Castillo, LLC, FWK Holdings, LLC, Rochester Drug Co-Operative, Inc ("FWK"), and KPH Healthcare Services, Inc., a/k/a Kinney Drugs, Inc. for its clobetasol class and FWK Holdings, LLC, Rochester Drug Co-Operative, Inc., and KPH Healthcare Services, for its clomipramine class. Defendants challenge the adequacy of each class representative. To meet Rule 23(a)'s adequacy requirement, DPPs must demonstrate that "the representative parties will fairly and adequately protect the interests of the class."[59] "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent. For a class representative to be adequate, it must have a minimal degree of knowledge about the case and have no conflict of interest with

---

[58] *Baby Neal v. Casey*, 43 F.3d 48, 56–57 (3d Cir. 1994).

[59] Fed. R. Civ. P. 23(a)(4). In addition, class counsel must be qualified, experienced, and fully capable of litigating the class members' claims. *In re Warfarin Sodium Antirust Litig.*, 391 F.3d 516, 532 (3d Cir. 2004). Defendants do not raise any issues as to Dianne Nast or NastLaw as class counsel.

class counsel and members of the class. Only fundamental conflicts will defeat the adequacy requirement."[60] The question is whether these class representatives "have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys."[61]

As a preliminary matter, there is no dispute that class counsel is well qualified—as required by Rule 23(e)(2)(A). DPPs argue that each Named Plaintiff shares the interests of other class members in establishing that Defendants engaged in an illegal conspiracy to artificially inflate prices paid by class members.[62] Defendants, however, argue that the class members cannot fairly represent all class members because of essential conflicts: first, that absent wholesaler class members are alleged to be coconspirators in the IRPs' complaint with Defendants in this case, and second, that the class representatives have failed to demonstrate familiarity with fundamental aspects of the litigation.

With regard to the wholesaler class members that are named as Defendants by the IRPs (AmerisourceBergen (now Cencora), Cardinal Health, H.D. Smith Wholesale, Harvard Drug, and McKesson), Defendants argue that IRPs' allegations that these entities conspired with Defendants, in turn, creates competing interests among the class members. However, this Court dismissed the IRPs' claim against Defendant Distributors (many of whom are DPPs in this action), finding that they did not plausibly allege that Distributors conspired with Defendants Manufacturers to raise the prices of generic drug products.[63] Defendants' argument regarding

---

[60] *In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.,* 967 F.3d 264, 272 (3d Cir. 2020) (internal quotation marks, citations, and brackets omitted).

[61] *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 61 (2d Cir. 2000) (citation omitted).

[62] DPPs' Mem. Supp. Mot. Certification Class Clomipramine Direct Purchasers at 28-29, 16-CM-27241, [Doc. No. 87].

[63] *In re Generic Pharms. Pricing Antitrust Litig.*, 2025 WL 388813, *2-5.

IRPs' complaint is, therefore, moot. Defendants' argument—that the interests of absent class members diverge from those of the DPPs because they are named as defendants in the IRP complaint—is thus moot.

Defendants additionally argue that four of DPPs' named plaintiffs lack a "minimal degree of knowledge" regarding the facts of this case to satisfy the adequacy standard.[64] The Court will consider the adequacy of each of these Plaintiffs.

*FWK Holdings, LLC*

First, Defendants argue that FWK Holdings, LLC is a shell company created in 2016 whose purpose is to purchase antitrust claims from the bankruptcy estate of wholesaler Frank W. Kerr Co and is "essentially operated by a close friend of one of plaintiffs' counsel".[65] Defendants argue that FWK does not maintain independence from class counsel, its sole member is not engaged in litigation, and FWK is, at best, lending its name to litigation without meaningful participation.[66] Defendants contend that FWK has been found inadequate as a class representative in other cases.[67]

According to Defendants, FWK was created with funding from attorneys at the law firm of Sperling & Slater, which represents FWK in this litigation along with the law firms of Hagens Berman and Kaplan & Fox. In 2019, a district court determined that considering the "close relationship between FWK and class counsel and the [c]ourt's assessment that FWK is not engaged in meaningful supervision of this case," FWK was not an adequate class

---

[64] DPPs' Mem. Supp. Mot. Certification Class Clomipramine Direct Purchasers at 40, 16-CM-27241, [Doc. No. 87] (citing *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007)).

[65] Defs.' Opp'n Class Certif. at 43, 16-CM-27241 [Doc. No. 99].

[66] *Id*. at 43.

[67] *Id*. at 42.

representative.[68] Defendants argue that FWK's dealings with class counsel are too entangled to allow FWK to persist in serving as a class representative. Further, Defendants argue that FWK has not demonstrated sufficient attention to key aspects of this litigation, and as a result its class representative failed to recall certain facts about the proceedings—such as the jurisdiction of the case.[69]

The circumstances here are distinct from those relied upon in *In re Intuniv Antitrust Litigation*. In that case, the attorney who was class counsel, Joseph Vanek, and his firms, Vanek, Vickers & Masini, P.C. and Sperling & Slater, P.C., entered into a referral agreement with Hagens Berman Sobol Shapiro LLC that guaranteed the Vanek and Sperling firms 10% of Hagens Berman's fees in *Intuniv*.[70] Although Mr. Vanek is counsel for FWK in the MDL, he is not the proposed class counsel, a significant difference from *Intuniv*. Moreover, DPPs represent that FWK has repaid all loans from Mr. Vanek and that Mr. Vanek has no financial interest in the clomipramine and clobetasol cases.[71] In the five years since the *Intuniv* decision, other courts have held that FWK is an adequate class representative.[72] Whether FWK is a "shell company" is not necessarily material to a court's determination that it is adequate—assignees may adequately represent a class and the court in *Intuniv* did not suggest otherwise.[73] The Court has determined

---

[68] *In re Intuniv Antitrust Litig.*, No. 1:16-cv-12653-ABD, 2019 WL 4645502, at *7-8 (D. Mass. Sept. 24, 2019).

[69] Defs.' Opp'n Class Certif. at 44-45, 16-CM-27241 [Doc. No. 99].

[70] *Intuniv*, 2019 WL 4645502, at *7.

[71] DPP's Reply Mem. Supp. Mot. Certification Class Clomipramine Direct Purchaser at 49, 16-CM-27241 [Doc. No. 105]. ("Neither Mr. Vanek nor any class counsel has any role in the operations of FWK, shares any fees with FWK, has any financial stake in FWK, or stands to gain from FWK's recovery beyond any contingent fee awarded.").

[72] *In re Zetia (Ezetimibe) Antitrust Litig.*, MDL No. 2:18-md-2836, 2020 WL 3446895, at *22 (E.D. Va. June 18, 2020) (vacated and remanded on other grounds). On appeal, the Fourth Circuit evaluated the District Court's opinion on this issue, finding FWK an adequate class representative.

[73] *See In re Wellbutrin Sr Direct Purchaser Antitrust Litig.*, No. 04-5525, WL 1946848, at *4 n.10 (E.D. Pa. May 2, 2008) (remarking that Defendants' only support for the proposition that an assignee cannot be an adequate class representative was denied on appeal).

that FWK is sufficiently disentangled from class counsel and that there is no conflict that would render FWK an inadequate class representative.

Regarding Defendants' contention that FWK is not sufficiently engaged in the litigation, the deposition transcript of FWK's Rule 30(b)(6) designee reveals a lack of knowledge of the litigation in some respects. FWK's representative testified that he never spoke with Dianne Nast, the proposed class counsel, and that he did not expect to be consulted about anything other than settlement.[74] But as DPPs point out, FWK has thoroughly participated in the suit, through voluminous production of discovery among other actions, and understands its obligations as a class representative.[75] Despite the representative's knowledge gaps, FWK's involvement is sufficient for it to adequately serve as a class representative.

*Rochester Drug Co-Operative, Inc.*

Defendants next argue that Rochester Drug Co-Operative, Inc. ("RDC"), a wholesaler which declared bankruptcy in 2020, is no longer an active participant in the litigation and its representatives demonstrate little familiarity with the cases.[76] Further, Defendants argue that its bankruptcy puts it in potential conflict with class members because it would seek to maximize its own assets to the benefit of its creditors, which could be at odds with the interests of the class as a whole.[77]

Only a fundamental conflict of interest is sufficient to impact a court's determination of adequacy.[78] The Court finds no fundamental conflict here. According to representatives for

---

[74] Ex. 11 FWK Tr. at 255, 16-CM-27241 [Doc. No. 99-111].

[75] DPP's Reply Mem. Supp. Mot. Certification Class Clomipramine Direct Purchaser at 50, 16-CM-27241 [Doc. No. 105].

[76] Defs.' Opp'n Class Certif. at 45, 16-CM-27241 [Doc. No. 99].

[77] *Id*. at 45-46.

[78] *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 183 (3d Cir. 2012).

RDC, the entity's bankruptcy plan was approved in 2021 and its claims were assigned to a liquidating trust.[79] Because the bellwether actions were filed before the existence of that trust, DPPs argue that the trust may continue to litigate in RDCs' name—and that the trust has done so.

Regarding potential conflicts, RDC has demonstrated that it is an active participant in the litigation and that arguments that the liquidating trust may act against the class's interests are not persuasive. RDC's designee has stated that it is motivated to litigate on behalf of the class.[80] The Court finds that a Chapter 11 bankruptcy filing itself does not render a potential class representative inadequate, that conflicts to disqualify class representatives must be more than speculative or hypothetical, that RDC's Chapter 11 bankruptcy poses less risk than other cases in which bankruptcy weighed on a court's finding of inadequacy, and that RDC's duty as a debtor-in-possession aligns with its role as a class representative.[81] The case in which RDC was rejected as a class representative is distinguishable as there the "defendants were significant creditors of Rochester's bankruptcy estate."[82] Here, Defendants contend not that any defendant is a creditor to RDC, but that its general duty to creditors presents a conflict. But their argument supposes only a hypothetical clash between the parties and is not sufficient to defeat RDC's adequacy as a class representative.

Nor does Defendants' argument that RDC is not an active participant in this litigation defeat adequacy. Defendants are correct that RDC's 30(b)(6) representative was unable to confirm whether clomipramine was a drug at issue in the litigation. But other factors indicate that

---

[79] Tr. of Class Certif. Hr'g (Dec. 18, 2024) at 67-68 [Doc. No. 3189].

[80] DPP's Reply Mem. Supp. Mot. Certification Class Clomipramine Direct Purchaser at 51, 16-CM-27241 [Doc. No. 105].

[81] *In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litigation,* 2021 WL 214302, at *4-6 (E.D. Pa. Jan. 21, 2021).

[82] *Id.* at *3.

RDC has adequately performed its duties as a class representative—RDC has continued to participate in litigation, has produced significant discovery, and RDC's designee was able to demonstrate an understanding of the steps RDC had taken to produce data and an understanding of other potential class representatives.[83]

*KPH Healthcare Services, Inc.*

As to KPH Healthcare Services, Inc. (Kinney Drugs, Inc.), Defendants argue that the 30(b)(6) representative demonstrated little to no knowledge of the case during the deposition.[84] KPH's corporate Designee, Brian Scott, did indeed profess unfamiliarity with certain aspects of the case, including venue, the meaning of certain terms, and the identities of the special masters.[85] In other segments of the deposition, however, Mr. Scott demonstrated knowledge of additional plaintiffs, defendants, an understanding of the drugs at issue in the bellwether cases, and the broad scope of the MDL.[86] As EPPs point out, KPH has articulated a clear understanding of its role as a class representative and its obligation to participate in litigation.[87]

That KPH's corporate designee did not recall whether an individual within the company reviewed KPHs' complaint before it was filed does not render its involvement so deficient as to fail the test for adequacy.

---

[83] Defs.' Opp'n Class Certif. Ex. 13 Dominick Pagnotta Dep. Tr. (Sept. 27, 2023) at 279-281, 16-CM-27241 [Doc. No. 99-13].

[84] Defs.' Opp'n Class Certif. at 46, 16-CM-27241 [Doc. No. 99].

[85] Defs.' Opp'n Class Certif. Ex. 15, KPH 30(b)(6) Dep. Tr. (Oct. 5, 2023) at 163, 16-CM-27241 [Doc. No. 99-15].

[86] *Id*. 165-67. In addition, Defendants omit from their exhibit one full page of Mr. Scott's deposition wherein he appears to answer questions relating to other plaintiffs in the case.

[87] DPP's Reply Mem. Supp. Mot. Certification Class Clomipramine Direct Purchaser at 54, 16-CM-27241 [Doc. No. 105].

*César Castillo, LLC (clobetasol only)*

Similarly to their argument against KPH, Defendants in the clobetasol case argue that César Castillo's 30(b)(6) representative demonstrated little to no knowledge of the case during the deposition.[88] Defendants argue that Cesar Castillo's representative, Luis Vazquez, demonstrated a significant lack of familiarity with this litigation. In Mr. Vazquez's deposition, however, he testified that he reviewed the complaints before they were filed and in preparation of his deposition, that César Castillo was aware of rising generic pharmaceutical prices, and that the company actively communicated with its attorneys during litigation.[89] Mr. Vazquez's lapses on certain factual circumstances in the clobetasol case, however, does not demonstrate so little knowledge on Cesar Castillo's part that they cannot participate as class representatives.

DPPs meet the requirements under Rule 23(a) for class certification.

### B.    Rule 23(b)

As DPPs meet the requirements under Rule 23(a) for class certification, the Court turns to Rule 23(b). A class action also must satisfy at least one of the three requirements listed in Rule 23(b).[90] DPPs proceed under Rule 23(b)(3), which provides that certification is appropriate if Rule 23(a) is satisfied and if:

> 3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
> > (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> > (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> > (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

---

[88] Defs.' Opp'n Class Certif. at 46, 16-CM-27241 [Doc. No. 99].

[89] Clobetasol Ex. 68 Luis Vazquez Dep. Tr.at 184-186; 196-198 16-CB-27241.

[90] *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 61 (2d Cir. 2000) (citation omitted).

(D) the likely difficulties in managing a class action.[91]

Defendants contest DPPs' ability to meet the predominance and superiority requirements. Defendants also argue that DPPs created an impermissible fail-safe class when they modified their class definition to exclude potential class members that did not suffer any injury.

In addition, the Third Circuit has held that "Rule 23(b)(3) has an implicit requirement that class members be ascertainable."[92] Ascertainability requires DPPs to show that "(1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition."[93]

Thus, the Court evaluates DPPs' arguments for predominance and superiority of the class action below. There is no dispute that the proposed DPP classes are ascertainable, which the Court briefly addresses.

    1.  <u>Predominance</u>

To certify a class under Rule 23(b)(3), "a district court must find that questions of law or fact common to class members predominate over any questions affecting only individual members."[94] "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof."[95] "In an antitrust class action, impact—i.e.,

---

[91] Fed. R. Civ. P. 23(b)(3).

[92] *In re Niaspan Antitrust Litig.*, 67 F.4th 118, 133 (3d Cir. 2023).

[93] *Lewis v. Gov't Employees Ins. Co.*, 98 F.4th 452, 462 (3d Cir. 2024) (internal citation omitted).

[94] *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (internal quotation marks and citation omitted).

[95] *Id*. (internal quotation marks and citation omitted).

individual injury—often is critically important for the purpose of evaluating Rule 23(b)(3)'s predominance requirement because it is an element of the claim that may call for individual, as opposed to common, proof."[96] This requires a "rigorous assessment of the available evidence and the method or methods by which plaintiffs propose to use the evidence to prove impact at trial."[97] A plaintiff need not prove that each element of their claim is susceptible to class wide proof, but rather that common questions "predominate over any questions affecting only individual [class] members."[98]

 DPPs contend that the proposed classes meet the bar for predominance, arguing that the presence of some individualized questions does not itself defeat predominance where those individualized questions do not overwhelm common questions in the case.[99] Here, DPPs argue that the focus of a potential trial would be on the alleged conspirators' conduct, not on any matter pertaining to individual class members.[100] This, they argue, is enough to satisfy established Third Circuit precedent on predominance in antitrust cases. In support, DPPs argue that class wide evidence can demonstrate the following: (1) that defendants conspired to raise drug prices, (2) antitrust impact, (3) that the conspiracy artificially inflated clomipramine prices, (4) that payment of overcharges due to the conspiracy was widespread among the class, and (5) that DPPs model for aggregate class-wide damages is reliable.[101]

 As support for their argument, DPPs offer the opinions of Dr. Jeffrey J. Leitzinger to estimate aggregate overcharges for each of the proposed direct purchaser classes, analyze the

---

[96] *Modafinil*, 837 F.3d at 262 (internal quotation marks and citation omitted).

[97] *In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d 305, 312 (3d Cir. 2008).

[98] *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 469 (2013).

[99] DPPs' Mem. Supp. Mot. Certification Class Clomipramine Direct Purchasers at 33, 16-CM-27241, [Doc. No. 87].
[100] *Id*. at 34.

[101] *Id.* at 36-42.

extent to which each of those buyers paid inflated prices due to Price Spikes,[102] and develop a method to allocate aggregate damages awards to members of each class for the DPP clobetasol and clomipramine cases.[103] Dr. Leitzinger's methodology is summarized in detail in the *Daubert* Opinion.[104] In short, Dr. Leitzinger employed a two-stage methodology to model overcharges. In Stage One, Dr. Leitzinger's model used IQVIA data[105] over time for generic drugs outside of the conspiracy to estimate normal market relationships between 3,400 generic drugs and normal market factors.[106] In Stage Two, Dr. Leitzinger used a regression model of Average Manufacturer Prices ("AMPs")[107] for both bellwether drugs on the prices predicted in Stage One.[108]

Defendants take issue with multiple facets of Dr. Leitzinger's report. As a preliminary matter, the *Daubert* ruling excluded only Dr. Leitzinger's alternative overcharge calculations (i.e., that the prices probably would have remained unchanged without the conspiracy), which does not affect the ability of DPPs to establish their claims.[109] Here, Defendants argue that DPPs do not meet their burden for predominance because Dr. Leitzinger's report masks variation

---

[102] Price Spikes refer to "large price increases beginning in May 2013 for clomipramine and June 2014 for clobetasol." For his report, Dr. Leitzinger assumes that these increases were the product of illegal conspiracies among Defendants. Leitzinger Expert Report, Harrell Decl. Ex A ¶ 7, No. 16-CM-24241 [Doc. No. 94-102]; No. 16-CB-24241 [Doc. No. 144-52] (hereinafter "Leitzinger Rep.").

[103] Leitzinger Rep. ¶ 7.

[104] *In re Generic Pharms. Pricing Antitrust Litig*., 2024 WL 4989070, at *15-20.

[105] IQVIA is healthcare consulting and analytics company that provides data to the life sciences industry. Entities use data from IQVIA to measure market and product demand. *See Prescription Information*, IQVIA, https://perma.cc/W8K7-2QZ3.

[106] Leitzinger Rep. § A.1.

[107] According to Dr. Leitzinger, "The AMP is 'the average price paid to the manufacturer for the drug in the United States by wholesalers for drugs distributed to the retail pharmacy class of trade.'" Leitzinger Rep. ¶13 (citing 42 CFR § 447.504; Christine Provost Peters, Medicaid Payment for Generic Drugs: Achieving Savings and Access [Internet], Washington (DC): National Health Policy Forum (Sept. 30, 2010) https://perma.cc/8963-YVCU.

[108] Leitzinger Rep. § B.1.

[109] *In re Generic Pharms. Pricing Antitrust Litig*., 2024 WL 4989070, at *22-23.

through averaging, the necessity of individualized inquiry, and because Dr. Leitzinger's model purportedly gives rise to an issue under the Supreme Court's decision in *Comcast Corp. v. Behrend*.[110] The Court addresses each of Defendants' arguments below.

### Lack of Common Proof of Impact and Damages Through Averaging

First, Defendants argue that DPPs lack common proof of impact and damages because Dr. Leitzinger's model impermissibly averages data in a way that glosses over differences in the relevant population.[111] The Third Circuit has found that an expert's use of averages presents a problem at class certification, and courts must analyze an experts' model to ensure that figures do not mask variation in terms of whether class members have suffered injury.[112] Specifically, Defendants argue that Dr. Leitzinger's use of IQVIA and AMP reflects an "uncritical reliance on averages" that renders his model insufficient to satisfy the predominance requirement.[113] In using both IQVIA and AMP data, Defendants allege that Dr. Leitzinger calculated a single annual percentage overcharge for each strength of formulation using data that is essentially an "average of an average."[114]

Defendants' arguments regarding Dr. Leitzinger's models for the purposes of predominance are largely duplicative of their arguments that his models were unreliable under *Daubert*.[115] In the *Daubert* opinion, the Court determined that Dr. Leitzinger's model was reliable and that he did not improperly employ averaging. Although the Court's analysis in

---

[110] 569 U.S. 27, 35-37 (2013).

[111] DPP's Reply Mem. Supp. Mot. Certification Class Clomipramine Direct Purchaser at 2, 16-CM-27241 [Doc. No. 105].

[112] *In re Lamictal Direct Purchaser Antitrust Litig.,* 957 F.3d 184, 194 (3d Cir. 2020)

[113] DPP's Reply Mem. Supp. Mot. Certification Class Clomipramine Direct Purchaser at 28, 16-CM-27241 [Doc. No. 105].

[114] *Id*.

[115] *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595-98 (1993).

*Daubert* was decided under a different standard, the same analysis applies here. There, the Court determined that Dr. Leitzinger's model did not mask data through averaging, which was apparent given that Dr. Leitzinger tested his results against Defendants' transaction data with no significant variation in results.[116]

For the purposes of class certification, Dr. Leitzinger's two-stage model is capable of using class-wide evidence to demonstrate impact and damages. As the Court determined in *Daubert*, his model is reliable and produces virtually the same results using multiple data sets.

### *Individualized Inquiries*

Defendants argue that given the small number of buyers, Dr. Leitzinger could have analyzed damages on an individual basis. Further, Defendants argue that DPPs' case may focus on the alleged conspiracy, but that many individualized facets of their case remain—including contractual negotiations.[117]

"Antitrust plaintiffs may satisfy the predominance requirement by using a model that estimates the damages attributable to the antitrust injury, even if more individualized determinations are needed later to allocate damages among class members.[118] As long as the DPPs' "theory of injury and damages is provable and measurable by an aggregate model relying on class-wide data," common issues predominate.[119] Although allocating the damages among class members may be necessary after judgment, "such individual questions do not ordinarily preclude the use of the class action device."[120]

---

[116] *In re Generic Pharms. Pricing Antitrust Litig.*, 2024 WL 4989070, at *18.

[117] Defendants also cited certain the wholesalers' status as defendants in the IRPs' action. As discussed above, the claims against the distributors have been dismissed.

[118] *In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264, 271 (3d Cir. 2020).

[119] *Id.*

[120] *Id.* at 272.

### Comcast Issue

Defendants contend that there is a *Comcast*[121] issue because Dr. Leitzinger does not establish that supposed overcharges suffered by DPPs are caused by Defendants' alleged conduct. In *Comcast Corp. v. Behrend*, plaintiffs proposed four separate theories of antitrust impact to certify a class of Comcast subscribers under Rule 23(b)(3) for alleged damages of federal antitrust laws.[122] Defendants argue that the Supreme Court's decision in *Comcast* dictates that the expert's model must "isolate damages resulting from any one theory of antitrust impact."[123]

The Court rejected Defendants argument on this point in its *Daubert* decision, as DPPs allege a single conspiracy claim under Section 1 of the Sherman Act.[124] For the same reason, *Comcast* does not provide a basis for Defendants to argue that DPPs do not establish predominance.

The common question that predominates in this matter is whether Defendants participated in a conspiracy to raise the prices of the bellwether drugs. DPPs have demonstrated that they will use common evidence as the basis for their argument, including testimony from witnesses, records of conversations between Defendants, depositions, and Defendants' documents.[125]

---

[121] 569 U.S. 27 at 38.

[122] *Id.* at 30-31.

[123] *Id*. at 32.

[124] *In re Generic Pharms. Pricing Antitrust Litig*., 2024 WL 4989070, at *20 ("In *Comcast*, plaintiffs proposed four separate theories of antitrust impact to certify a class of Comcast subscribers under Rule 23(b)(3) for alleged damages of federal antitrust laws. In contrast, DPPs assert one theory of antitrust impact; that is, a conspiracy to increase prices resulting in a single theory of antitrust injury.") (citations omitted).

[125] DPP's Reply Mem. Supp. Mot. Certification Class Clomipramine Direct Purchaser at 28, 16-CM-27241 [Doc. No. 105].

2.  Superiority of Adjudication

Plaintiffs are required to show under Rule 23(b)(3) that class treatment is superior to other methods for achieving a "fair and efficient" adjudication of the controversy. This requirement essentially asks a court to analyze the class members' interests in pursuing a class action versus joinder and individual actions, the extent of litigation already begun by class members, the benefit of litigating in one forum, and the difficulty of managing a class action.[126]

The parties' arguments are largely duplicative to those made in connection with numerosity—DPPs argue that class certification is superior, while Defendants argue that a class action is not a superior means of adjudicating the case because a joinder action is a workable and efficient mechanism to resolve the claims of all Plaintiffs. DPPs have satisfied their burden in demonstrating that class adjudication is superior to joinder in this circumstance. First, class members have demonstrated an interest in proceeding as a class rather than through individual action. As Defendants note, multiple large entities in the class with significant claims have chosen not to proceed as DAPs, potentially due to ongoing relationships between those entities and Defendants.[127] Further, some DAPs in the potential class have indicated to the Court that they do not plan to opt out of the suit if the class is certified.[128] Together, the benefit of litigating in one forum, the complexity of the MDL, and the importance of efficiently and effectively examining the antitrust allegations indicate that central adjudication of these issues is a superior path forward for this litigation. Thus, superiority weighs in favor of class certification.

---

[126] *In re Avandia Marketing, Sales Practices and Products Liability Litigation*, No. 07-MD-1871, 2024 WL 6684343, at *6 (E.D. Pa. Nov. 24, 2014); *Modafinil*, 837 F.3d at 253 n.11.

[127] Tr. of Class Certif. Hr'g (Dec. 18, 2024) at 14; 72 [Doc. No. 3189].

[128] DPP's Reply Mem. Supp. Mot. Certification Class Clomipramine Direct Purchaser at 16, 16-CM-27241 [Doc. No. 105].

### 3. Ascertainability

DPPs must prove, by a preponderance of the evidence, that class certification is ascertainable.[129] This requires DPPs to demonstrate that "(1) the class is 'defined with reference to objective criteria'; and (2) there is 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'"[130] Ascertainability does not require a plaintiff to identify all class members at the class certification stage, but rather to make a showing that class members *can* be identified.[131] The purpose of the Third Circuit's ascertainability requirement is to avoid extensive individual fact-finding, or "mini-trials," to determine whether prospective members are properly included in a class.[132]

Defendants do not dispute that DPPs' proposed class definition is precise and ascertainable. Because potential claimants are direct purchasers, class members are readily identifiable using transaction-level sales data. DPPs have satisfied the Third Circuit's ascertainability requirement.

Thus, the Rule 23(b) factors weigh in favor of class certification.

### 4. Fail Safe Class

As discussed above, in their opposition to the class certification motions, Defendants argue that certain potential class members may not have suffered any injuries.[133] To counter this argument, DPPs revised the class definitions in their reply memoranda to "exclude by definition . . . the purchasers that Defendants say were uninjured, mooting Defendants' arguments that

---

[129] *In re Niaspan Antitrust Litig.*, 67 F.4th 118, 133 (3d Cir. 2023).

[130] *Byrd v. Aaron's Inc.,* 784 F.3d 154 (3d Cir. 2015), as amended (Apr. 28, 2015) (quoting *Carrera*, 727 F.3d at 306).

[131] *Carrera*, 727 F.3d at 308 n. 2.

[132] *Marcus v. BMW of North America, LLC*, 687 F.3d at 592–94 (3d Cir. 2012).

[133] Defs.' Opp'n Class Certif. at 25-26, 16-CM-27241 [Doc. No. 99].

impact to the Class cannot be proven with class-wide evidence."[134] But that revision prompted another argument from Defendants: that the revised class certification would create an impermissible "fail-safe" class, because "DPPs have made a liability finding a 'necessary condition for membership in the class.'"[135]

"A fail-safe class is one that is defined so that whether a person qualifies as a member depends on whether the person has a valid claim. While [the Third Circuit has] never expressly held that fail-safe classes are impermissible, other circuits, such as the Seventh Circuit, have held that fail-safe classes are improper because they enable one-way intervention."[136] The concern with such a class definition is "because a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment."[137] Meaning that, if a fail-safe class exists, class members cease to be a part of the class if there is a finding of no liability. For example, where a class included only individuals who were found to have provided "prior consent," it was an impermissible fail-safe class because the issue of whether or not "prior consent" existed was a question of liability for the jury.[138] Should the jury have found that "prior consent" did not exist, the class would have ceased to exist and no member would have been bound by the judgment in favor of defendants.[139]

---

[134] DPP's Reply Mem. Supp. Mot. Certification Class Clomipramine Direct Purchaser at 10 n.2, 16-CM-27241 [Doc. No. 105].

[135] Defs.' Resp. to DPPs' Further Reply in Supp. Mot. Class Certif. at 10, 16-CM-27241 [Doc. No. 199. (quoting *Spano v. Ohio Hospice and Palliative Care*, 2018 WL 646142, at * 3 (W.D. Pa. Jan. 1, 2018)).

[136] *Wolff v. Aetna Life Ins. Co.,* 77 F.4th 164, 170 n.4 (3d Cir. 2023) (internal quotation marks and citations omitted).

[137] *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012), quoted in Wolff, 77 F.4th at 179 n.4.

[138] *Zarichny v. Complete Payment Recovery Servs., Inc*., 80 F. Supp. 3d 610, 623-24 (E.D. Pa. 2015).

[139] *Id*.

Defendants take issue with DPPs' revised class definitions because, they argue, DPPs' revised language makes inclusion in the class contingent on whether there was a "conspiratorial price increase." Should a jury find that there was no "conspiratorial price increase," Defendants say that the classes would cease to exist and no party within could be bound by the outcome of trial.[140] Defendants' counsel stated at oral argument that the issue here is where the DPPs tie their class definition directly to the conspiracy, which requires a finding of liability.[141] But while DPPs indicated in the footnote *introducing* their revised definition that the new exclusions would remove "direct purchasers who purchased clomipramine (a) prior to the conspiratorial price increases and (b) after the conspiratorial price increases but did not experience a price increase,"[142] their actual updated class definition contains no mention of "conspiratorial" price increases. Rather, the updated class definition excludes entities that

> (i) purchased at least one strength of clomipramine (i.e., 25, 50, or 75mg capsules) during the period March 18, 2012 to March 17, 2013 ("Clomipramine Pre Period") and at least one of the same strengths during the Clomipramine Class Period and (ii) whose purchase prices (measured in dollars and cents) for all of the strength(s) purchased in both Periods did not increase during the Clomipramine Class Period as compared to the Clomipramine Pre Period.[143]

This distinction is key because it means that the class definition does not rely on any finding of liability—whether or not a jury finds that there was a *conspiracy* that caused price increases, it includes or excludes entities based solely on whether they paid more after the alleged conspiracy. Should a jury find that there was no conspiracy, the definition—as written—would still bind class members, i.e., those who paid more over the relevant time frame.

---

[140] *See* Defs. Corrected Sur-Reply Supp. Opp'n to DPPs Mot. Class Certification at 45-46, 16-CB-27241 [Doc. No. 182].

[141] Tr. of Class Certif. Hr'g (Dec. 18, 2024) at 50 [Doc. No. 3189].

[142] DPP's Reply Mem. Supp. Mot. Certification Class Clomipramine Direct Purchaser at 9, 16-CM-27241 [Doc. No. 105].

[143] *Id*.

At oral argument, Defendants presented another theory that the revised proposed classes pose a fail-safe issue. There, Defendants argued that a potential jury could find that the conspiracy occurred at a different time, or for a different duration of time than the class periods proposed in the revised class definitions.[144] If that did occur, Defendants argue that class members would fall out of the class. The Court is not convinced by Defendants' argument— inclusion of a class period in the class definition does not create a fail-safe issue.

DPPs' revised definition does not present a fail-safe issue. Should they have included "conspiratorial price increases" in their revised definition, the Court's decision may very well have been different. As it stands, regardless of the phrasing DPPs used to introduce their revision, the revised class definition does not exclude entities on the basis of liability.

## IV.    CONCLUSION

For the reasons explained above, DPPs' motions for class certification and for appointment of class counsel will be granted.

An order will be entered.

---

[144] Tr. of Class Certif. Hr'g (Dec. 18, 2024) at 50 [Doc. No. 3189].